**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.

SONA KAMAT, M.D.,
GLENN R. PARRIS, M.D.,
IRAJ SABAHI, M.D.,
ATUL SINGHAL, M.D., and
LOURDES APONTE, M.D.,

Plaintiffs,

vs.

BENDCARE, LLC,
ANDREW RIPPS, and
YOSHIHIRO BARREIRINHAS,

Defendants.

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiffs Sona Kamat, M.D., Glenn R. Parris, M.D., Iraj Sabahi, M.D., Atul Singhal, M.D., and Lourdes Aponte, M.D. (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby allege the following against Defendants Bendcare, LLC, Andrew Ripps, and Yoshi Barreirinhas (collectively, "Defendants").

## INTRODUCTION

1. Plaintiffs are board-certified rheumatologists who own and operate independent rheumatology practices in California, Delaware, Georgia, Missouri, and Texas.

2. Rheumatologists specialize in treating inflammatory and autoimmune diseases affecting joints and connective tissue. These disease processes cause chronic, debilitating symptoms. Treatment of these processes include infusion of biologic medications.

3. Due to the high cost of infusion drugs, effective negotiation of the drug price—and more importantly, pharmaceutical rebates and discounts provided by manufacturers—is critical to the financial viability of a rheumatology practice.

4. Absent rebates, rheumatology practices earn little to no margin on physician-administered biologic infusions because the standard reimbursement from insurers sometimes does not even cover the drugs' acquisition and administration costs. Rebates are thus necessary to ensure certain therapies are financially viable for the practices.

5. Other components of successfully managing a rheumatology practice include, but are not limited to, contracting and negotiating reimbursement rates with payors, managing insurance coverage and prior authorization issues, properly billing the physicians' services and the cost of drugs to insurers for reimbursement, and managing claim denials and payor appeals.

6. Defendant Bendcare LLC ("Bendcare") is a management services organization ("MSO") that purports to provide all or part of the aforementioned operational and administrative services to rheumatology practices.

7. In addition to saving the physicians' time, Bendcare promised that it would generate substantial revenues and cost savings for physicians who joined the Bendcare "network."

8. At numerous networking and marketing events across the country, Bendcare's principals Andrew Ripps and Yoshi Barreirinhas represented that Bendcare's business model is not to profit off of physicians or to take a percentage of their collections. Instead, Bendcare would charge a flat monthly fee of $550 and pass through to the practices all financial benefits that Bendcare obtained from manufacturers and wholesalers on the practices' behalf through group purchasing and contracting.

9. These financial benefits included, *inter alia*, (1) the "highest rebates available" paid by manufacturers for injectable and infusion drugs, and (2) lower drug prices Bendcare negotiated with wholesalers and manufacturers.

10. Specifically as to rebates, Ripps and Barreirinhas repeatedly stated that Bendcare's model was to "push it all to the rheumatologist." Bendcare promised that it would remit manufacturer rebates to the practices on a 100% pass-through basis.

11. Another selling point for Bendcare was that physicians could unlock revenue streams and cost savings without overhauling their practices. Ripps stated that Bendcare-managed practices "are making anywhere from $20,000 to $300,000

extra dollars per year … doing the same thing they'd done before." By simply joining Bendcare, physicians could "unlock all this real money, just doing the same thing you did before you joined."

12. As Ripps and Barreirinhas put it, "the power of the rebates […] that's really ***found money***."

13. The above representations (later learned to be misrepresentations) successfully persuaded Plaintiffs and other rheumatologists nationwide to sign up with Bendcare.

14. However, the increased rebates and other financial benefits were false promises that never materialized for Plaintiffs.

15. As Plaintiffs would later come to learn, Bendcare retained at least **50% to 70%** of rebates received from manufacturers.

16. There is no provision in any of the contracts between Plaintiffs and Bendcare that permits Bendcare to retain rebates.

17. Bendcare's promise to pass through all rebates to the rheumatologists was a blatant lie.

18. Bendcare's other representations that practices would see lower drug costs and that Bendcare did not make money on group purchasing were also false.

19. Although Bendcare negotiated rates with manufacturers and wholesalers, Bendcare did not give Plaintiffs access to those lower prices.

20. Instead, Bendcare implemented a spread pricing scheme wherein Bendcare effectively re-sold the drugs it purchased from wholesalers/manufacturers

back to the practices at a mark-up—i.e., at a price ***higher*** than what the wholesalers/manufacturers actually charged, allowing Bendcare to pocket the difference as pure profit.

21. Again, there is no provision in the contracts between Plaintiffs and Bendcare that permits Bendcare to earn "spread" by charging the practices more for drugs than the drug prices that Bendcare negotiated and obtained from drug manufacturers and wholesalers.

22. As a result of this spread pricing scheme, Plaintiffs' practices ended up paying higher drug costs than what the practices could negotiate individually with wholesalers, entirely defeating the purpose of the MSO in the first place.

23. Combined with Bendcare's rebate retention practices and other service failures, Bendcare's management began to have a material adverse impact on Plaintiffs' practices.

24. Over the course of their relationship with Bendcare, Plaintiffs purchased several hundred million dollars' worth of medication through the Bendcare platform.

25. Ripps and Barreirinhas used these siphoned revenues to personally enrich themselves. The misappropriated rebates and other revenues were diverted to numerous accounts within Ripps' and Barreirinhas' control.

26. Bendcare sold its services as a trustworthy and reliable partnership that would bring substantial financial benefits, including pass-through of rebates and drug prices negotiated on a collective basis. In reality, however, the MSO

arrangement was a sham full of lies designed to induce Plaintiffs to give Bendcare access to their patients and drug purchases so that Bendcare could exploit them.

27. The above conduct constitutes a breach of contract, fraudulent inducement, breach of fiduciary duty, and a deceptive trade practice in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq*.

28. Through the rebate retention, spread pricing, and other breaches alleged herein, Plaintiffs have suffered significant damages to be proved at trial.

## THE PARTIES

29. Plaintiff Sona Kamat, M.D., is a board-certified rheumatologist who is a citizen of and resides in St. Louis County, Missouri. Dr. Kamat owns and operates an independent rheumatology practice with its principal business address located at 13100 Manchester Road, Suite 70, St. Louis, Missouri 63131.

30. Plaintiff Glenn R. Parris, M.D., is a board-certified rheumatologist who is a citizen of and resides in Gwinnett County, Georgia. Dr. Parris owns and operates an independent rheumatology practice with its principal business address located at 4850 Sugarloaf Parkway Suite #501 Lawrenceville, GA 30044.

31. Plaintiff Iraj Sabahi, M.D., is a board-certified rheumatologist who is a citizen of and resides in Stanislaus County, California. Dr. Sabahi owns and operates an independent rheumatology practice with two office locations, at 2161 Colorado Ave., Suite A2, Turlock, CA 95382, and at 5776 Stoneridge Mall Rd., Suite 220, Pleasanton, CA 94588.

32. Plaintiff Atul Singhal, M.D., is a board-certified rheumatologist who is a citizen of and resides in Dallas County, Texas. Dr. Singhal owns and operates an independent rheumatology practice with its principal business address located at 1600 Republic Pkwy, Suite 200, Mesquite, TX 75150.

33. Plaintiff Lourdes Aponte, M.D., is a board-certified rheumatologist who is a citizen of and resides in Sussex County, Delaware. Dr. Aponte owns and operates an independent rheumatology practice with its principal business address located at 1302 Savannah Rd, Lewes, DE 19958.

34. Defendant Bendcare, LLC is a limited liability company organized under the laws of Florida, with its headquarters and principal place of business located at 2255 Glades Rd., #228w, Boca Raton, FL 33431. Upon information and belief, Bendcare's members are Andrew Ripps, Yoshihiro Barreirinhas, Steve Chaney, Robert Walshon, Ira Coleman, and Florida Arthritis & Rheumatology Associates, LLC, all of whom are residents of, and domiciled in, Florida.[1]

---

[1] Florida Arthritis & Rheumatology Associates, LLC d/b/a American Arthritis & Rheumatology Associates ("AARA") is comprised of Florida physicians who are licensed and operate rheumatology practices in Florida, including Howard M. Busch, William A. Sunshine, Michael A. Weitz, George E. Munoz, Jeffery A. Alper, Yvonne Smallwood Sherrer, and Steven C. Kimmel, who are all residents of Florida. Although AARA purports to have physicians outside the state of Florida in its membership, no such physicians actually signed AARA's LLC Operating Agreement which is required to formally join the LLC as a member. Instead, any non-Florida physicians that wanted to "join" AARA were required to be members of a state-specific AARA affiliate which is a separate and distinct LLC from Florida Arthritis & Rheumatology Associates, LLC. For instance, Dr. Parris was the sole member of American Arthritis & Rheumatology Associates – GA, LLC. Dr. Kamat was the sole member of American Arthritis & Rheumatology Associates – MO, LLC. Dr. Sabahi was a member of American Arthritis & Rheumatology Associates – CA, P.C. Dr. Singhal was a member

35. Defendant Andrew Ripps is a citizen of and resides in Palm Beach County, Florida. Ripps is the Chief Executive Officer of Bendcare.

36. Defendant Yoshihiro "Yoshi" Barreirinhas is a citizen of and resides in Palm Beach County, Florida. Barreirinhas is the Chief Financial Officer of Bendcare.

## JURISDICTION AND VENUE

37. This Court has original diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiffs and Defendants are citizens of different states and the matter in controversy, exclusive of interest and costs, exceeds $75,000. Complete diversity exists because no Plaintiff is a citizen of the same state as any Defendant or its members.

38. This Court has personal jurisdiction over Bendcare, Ripps and Barreirinhas because these Defendants reside or are headquartered in Florida and regularly conduct business in Florida. Bendcare has marketed, promoted, distributed, and sold its services in Florida, and the funds misappropriated from Plaintiffs were funneled to Defendants' accounts in the state of Florida.

39. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because all Defendants reside in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

---

of American Arthritis & Rheumatology Associates – TX, PLLC. Dr. Aponte was a member of American Arthritis & Rheumatology Associates – DE, P.A.

## FACTUAL ALLEGATIONS

### A. The MSO Agreements Between Plaintiffs and Bendcare

40. Each Plaintiff is a board-certified rheumatologist who owns and operates an independent rheumatology practice in five different states.

41. Each Plaintiff either directly entered into a contract with Bendcare on behalf of their practice (as in the case of Dr. Kamat and Dr. Parris), or received management services from Bendcare as part of a separate MSO contract between Bendcare and a third-party group practice entity to which Plaintiff is neither a signatory nor party.[2]

42. The written contracts pursuant to which Bendcare provided services to Plaintiffs (collectively referred to as the "MSO Agreement")[3] are materially similar and appointed Bendcare the exclusive provider of management services to the practice, including but not limited to:

i. Payor contracting and negotiating payor rates;

ii. Cost-effective selection of insurance, equipment, supplies, and pharmaceuticals;

iii. Human resources, payroll, and employee benefits;

iv. Information technology and electronic medical record systems;

---

[2] As to this latter contract, none of the physicians signed, or even saw, the agreement.

[3] For purposes of this Complaint, "MSO Agreement" encompasses both the written terms in the formal written contracts, and oral terms that Bendcare and Plaintiffs assented to outside of the written instruments—i.e., that Bendcare would pass through rebates, and provide the lowest available drug pricing and higher payor reimbursements, to the practices.

v. Payor credentialing; and

vi. Billing, collections, accounts payables, and other financial management.

43. The MSO Agreement gives Bendcare exclusive special power of attorney over billing, collections, expense reimbursement and account transfers.

44. In light of the high degree of trust and control reposed in Bendcare, which Bendcare accepted and undertook to provide, Bendcare owed a fiduciary duty to Plaintiffs and their practices regarding the services covered by the MSO Agreement.

45. Indeed, Bendcare held itself out as an expert in the areas of drug purchasing, rebate administration, pharmaceutical contracting, and billing and financial management.

46. In exchange for the aforementioned services, Plaintiffs, through their respective practices, agreed to pay Bendcare certain fees, including a monthly "management fee" of $550, as set forth in the MSO Agreements.

47. However, none of the Agreements allow Bendcare to retain a portion of the revenues, collections, or rebates earned by the practices above the contractually agreed-upon fees. In fact, as to rebates, the MSO Agreements are silent as to whether Bendcare may retain any portion of rebates it receives from drug manufacturers based on the drugs purchased and utilized by Plaintiffs' practices.

48. As explained below, Bendcare not only materially breached the Agreements, but committed fraud, conversion, and breach of its fiduciary duties to

Plaintiffs by retaining a substantial portion of the rebates and charging the practices substantially more than the drug costs Bendcare negotiated with wholesalers on behalf of the group. The Plaintiff-physicians (who are not experts in drug purchasing or contracting) reasonably relied on Bendcare's representations regarding rebates and other financial cost savings.

49. Bendcare further injured Plaintiffs through repeated and grossly negligent service failures, including mismanagement of critical administrative functions, including billing, credentialing, submission of Medicare Merit-based Incentive Payment System ("MIPS") data, challenging claims denials and appeals, and accepting under-water reimbursement on high-cost drug claims, among other breaches.

**B. Bendcare's Nationwide Misrepresentation Campaign**

50. Each Plaintiff entered into the MSO Agreement in reliance on representations made by Bendcare, Ripps, and Barreirinhas directly to Plaintiffs. These representations were made at various networking events and through written communications.

51. At the national summits and networking events, Defendants committed to delivering substantial financial benefits to physicians through favorable group reimbursement, drug costs, and rebates that Bendcare collectively negotiates with third parties.

52. Central to Bendcare's value proposition was its pass-through business model. Bendcare claimed that its philosophy was not to profit off of the physicians,

but rather the cost savings and higher rebates/revenues that Bendcare negotiated with third parties would flow to the practices.

53. Ripps and Barreirinhas personally made these representations at various "networking" events across the country between 2015 and 2024 and actively concealed their fraud from Plaintiffs.[4]

54. At these networking events, Ripps and Barreirinhas gave presentations touting the manifold economic benefits that practices could obtain by hiring Bendcare's management services. The presentations were given by both Ripps and Barreirinhas, with Ripps as the primary speaker while Barreirinhas expressed agreement with, and further bolstered, Ripps' economic-benefits claims.

55. For example, at a September 2017 networking event in San Francisco, Ripps and Barreirinhas stated as to rebates:

a. "We have contracts with big pharma [for rebates]. We're already releasing rebates... here's our model. We just ***push it all to the rheumatologist***."

b. "The manufacturer has given us a group rebate because we are a group." Physicians receive the rebates "for your utilization. So you all share in group buying, and you get individually rewarded for your own utilization."

[4] As discussed in Section H. below, Defendants actively concealed their fraudulent representations and conduct from Plaintiffs, so none of the representations or claims are barred by the applicable statute of limitations.



#5087414v2-221545.0001

c. Bendcare had rebate contracts with "J&J, Genentech, UCB. We have all of them [manufacturers]."

d. Some physicians were "achieving up to a hundred thousand dollars" in "extra rebates" for "doing the same thing, doing nothing different."

e. The power of the rebates. I mean, that's really found money."

56. As to lower drug costs, Ripps and Barreirinhas stated:

a. "We're just a leverage purchaser… we've negotiated great discounts on the front end, amazing terms on the back end."

b. "We're getting close to a hundred and fifty million dollars in purchases" through Bendcare's group purchasing organization ("GPO").

c. At that volume, Bendcare could "access a product at the total lowest price"

d. The drug cost negotiated by Bendcare is "better than the independent physician can do on his or her own."

57. As to higher payor reimbursement, Ripps and Barreirinhas represented:

a. Bendcare negotiated reimbursement rates with insurance companies as a group, would "try and get the highest rates" for Bendcare physicians.

b. Furthermore, Bendcare had a "managed care team" with the "tenacity and ability to hold [payors] accountable" and would contest claim denials and payment clawbacks.

58. At another summit event that took place in September 2015 in New Orleans, Ripps reiterated that Bendcare's "mission was not to make a dollar off of

your... practice" and that physicians did not need someone "taking percentages off of your back."

59. At this meeting, Ripps called even a 2% administrative fee charged by other GPOs "garbage" and emphasized that Bendcare does not take any of the revenue generated by the physicians' practices, stating, "We touch nothing. Nothing. Zero."

60. Ripps reiterated that Bendcare charged a fair market value management fee of $550 per month, and in exchange for that fee, all of the benefits of collective bargaining and group purchasing would be passed on to the practices.

61. At a 2018 networking event in Colorado, Ripps stated that the "rebates are yours ... They're yours because you did the work, and you still get dividends."

62. However, Ripps claimed Bendcare could not disclose the rebates to the physicians because Bendcare's rebate contracts require confidentiality and Bendcare was "asked by Big Pharma not to disclose them."

63. At a February 2018 networking event in San Diego, Ripps stated that Bendcare negotiated rebates with manufacturers that were "best in the market today" and at the "highest [rebate] tiers." Physicians would "keep [their] own rebates" and receive rebates based on their "own volume."

64. At the San Diego event, Barreirinhas added that there would be "no catches or surprises" because Bendcare did not follow the "old model" where MSOs "make money out of your back" by taking a portion of the physicians' overall revenue.

65. Ripps and Barreirinhas both made substantially similar representations at networking events attended by Plaintiffs between 2015 and 2024 held across the country, including but not limited to in Arizona, Colorado, Washington, D.C., Florida, Georgia, Louisiana, Massachusetts, Nevada, North Carolina, Tennessee, Texas, and Utah.

66. Specifically, Dr. Kamat attended numerous networking events between 2020 and 2024, where Ripps and Barreirinhas made specific representations that Bendcare would provide the benefits of rebates, drug pricing, and payor reimbursement rates negotiated with manufacturers, wholesalers and payors to physician practice on a pass-through basis, including:

a. June 2020: Naples, FL
b. December 2021: Aventura, FL
c. April 2022: Las Vegas, NV
d. March 2023: New Orleans, LA
e. April 2024: Las Vegas, NV
f. June 2024: Colorado Springs, CO
g. December 2024: Aventura, FL

67. Dr. Sabahi attended numerous networking events between 2017 and 2024, where Ripps and Barreirinhas made specific representations that Bendcare would provide the benefits of rebates, drug pricing, and payor reimbursement rates negotiated with manufacturers, wholesalers and payors to physician practice on a pass-through basis, including:

a. September 2017: San Francisco, CA
b. February 2018: San Diego, CA
c. September 2018: San Francisco, CA
d. February 2019: San Diego, CA
e. March 2022, Las Vegas, NV
f. April 2024: Las Vegas, NV

68. Dr. Parris attended numerous networking events between 2020 and 2024, where Ripps and Barreirinhas made specific representations that Bendcare would provide the benefits of rebates, drug pricing, and payor reimbursement rates negotiated with manufacturers, wholesalers and payors to physician practice on a pass-through basis, including:

a. February 2020: Orlando, FL
b. June 2020: Naples, FL
c. January 2021: Scottsdale, AZ
d. May 2021: Nashville, TN
e. July 2021: Colorado Springs, CO
f. December 2021: Aventura, FL
g. March 2022: Las Vegas, NV
h. December 2022: Miami, FL
i. March 2023: New Orleans, LA
j. December 2023: Orlando, FL
k. April 2024: Las Vegas, NV
l. June 2024: Colorado Springs, CO
m. September 2024: Atlanta, GA
n. December 2024: Aventura, FL

69. Dr. Singhal attended numerous networking events between 2016 and 2022, where Ripps and Barreirinhas made specific representations that Bendcare would provide the benefits of rebates, drug pricing, and payor reimbursement rates negotiated with manufacturers, wholesalers and payors to physician practice on a pass-through basis, including:

a. June 2016: New York, NY
b. December 2016: Fort Lauderdale, FL
c. December 2019: Miami, FL
d. December 2021: Aventura, FL
e. August 2022 : Delray Beach, FL
f. December 2022: Aventura, FL

70. Dr. Aponte attended numerous networking events between 2015 and 2020, where Ripps and Barreirinhas made specific representations that Bendcare would provide the benefits of rebates, drug pricing, and payor reimbursement rates negotiated with manufacturers, wholesalers and payors to physician practice on a pass-through basis, including:

a. A 2015 event in Florida
b. June 2017: New York, NY
c. Aug. 2020: Washington, DC

71. Ripps and Barreirinhas continued to make similar representations to physicians after they joined Bendcare.

72. For example, at a 2017 annual Bendcare meeting in Nashville, Tennessee, attended by physicians nationwide, Ripps reaffirmed that Bendcare was unlocking greater revenues and rebates for its physicians, who were receiving many thousands of dollars in quarterly rebate checks that they did not have access to previously.

73. Bendcare made substantially the same representations in written communications to its members, including Plaintiffs.

74. For example, the onboarding email that each physician, including Plaintiffs, received from Bendcare upon joining the MSO listed the following "benefits" that the physicians would receive:

- Purchasing – National purchase power group savings and rebates on medical supplies, employee health insurance/ malpractice insurance, DME and drugs. As the largest national rheumatology group currently

purchasing $500+ million per year in biologics results in the ***deepest discounts in the marke***t as well as the ***highest rebates available***.

- Contracting – Our group payor solutions team will get you credentialed with each of the payors then continue to renegotiate all of your contracts to ensure that you are getting the ***best reimbursement rates available in the local and national market*** as an individual office and national group.

75. Similar statements were made on Bendcare's website, which stated that the MSO provided physician practices greater "purchase power" and the practices would be added to "all contracts, pricing, and rebate agreements" with wholesalers and manufacturers.

76. In sum, for years, Ripps and Barreirinhas attracted physicians and rheumatology practices to their MSO by promising that Bendcare does not profit by siphoning the practices' revenues (less fees allowed under the MSO Agreement), and instead passes along all cost savings, higher reimbursement rates, and quarterly rebate checks that it negotiates with third parties to the practices.

77. Ripps and Barreirinhas further promised transparency and fairness regarding how those revenues would be allocated and distributed to physicians.

78. Reasonably and justifiably relying upon Defendants' representations, hundreds of rheumatology practices nationwide, including Plaintiffs, decided to entrust Bendcare with the management of their practices.

79. Plaintiffs continued to rely on these representations after entering into MSO Agreements with Bendcare.

80. Plaintiffs would not have entered into the MSO Agreements or continued to pay the monthly $550 and other fees in the MSO Agreements had they known that Bendcare's representations regarding rebate pass-through, lowest available drug pricing, and higher payor reimbursements were false.

81. Plaintiffs also would not have remitted payment on the drug purchase invoices issued by Bendcare had they known that Bendcare was effectively re-selling the drugs at a mark-up, in flagrant violation of their promise to provide the "deepest discounts in the market."

82. Plaintiffs would not have agreed to the MSO Agreements with Bendcare had they known their practices would be exploited by Bendcare to steal rebates and payor reimbursements.

### C. Bendcare Secretly Retained 70% or More of Rebates, While Concealing the Same from Plaintiffs, Despite Falsely Promising to Pass Through 100% of the Rebates

83. Defendants knew that the representations regarding Bendcare's transparency and pass-through of rebates and other cost savings to the practices were false when they were made.

84. In actuality, Bendcare did not pass through all of the rebates and lower drug costs to the practices.

85. Bendcare retained anywhere from **50% to 70%** (possibly more) of the rebates received from drug manufacturers, but did not disclose this fact to its physicians, including Plaintiffs.

86. Ripps and Barreirinhas also refused to share the rebate agreements Bendcare and its GPO negotiated with drug manufacturers, claiming that the terms were confidential.

87. The substantial rebate checks that Bendcare promised to deliver never materialized for Plaintiffs.

88. In reality, Plaintiffs received rebates ***far below*** the rates they could obtain directly from drug manufacturers, or from joining another GPO.

89. To be clear, rebates are not simply another type of revenue generated by Plaintiffs or by Bendcare; rather, they are discounts on the prices of drugs already purchased and utilized by Plaintiffs' practices that are necessary to ensure that medically necessary therapies are financially viable and available to patients. Absent rebates, Plaintiffs would incur a net *loss* on some therapies due to the high cost of infusion drugs coupled with low insurance reimbursement for those treatments.

90. Bendcare has no legal basis to claim, receive, or retain any portion of the rebates that the manufacturers paid based on the drugs utilized by the practices.

91. Beginning in or around early 2025, Plaintiffs and numerous other physicians sought clarity from Bendcare as to the rebate rates they actually received for the drugs purchased and utilized. These inquiries were made in person, by email, and through a Teams group chat.

92. Due to mounting pressure from the physicians for an "actual breakdown of where the rebates go," Ripps and Barreirinhas finally disclosed, in or around May 2025, that Bendcare had been retaining rebates. Defendants further disclosed that Bendcare was retaining as much as 70% (or more) of rebates as of 2025.

93. In making that disclosure, Bendcare made clear that the 70% rebate retention rate reflected "the standard formula"—i.e., that Bendcare had been retaining the same portion of rebates for years, likely from the very beginning.

94. In December 2025, Dr. Sabahi had an in-person meeting with Ripps about Bendcare's unauthorized retention of rebates.

95. At the meeting, Ripps did not deny that Bendcare took up to 70% of rebates from drug manufacturers, and even acknowledged that Bendcare always had a practice of taking a portion of rebates on the drug Orencia, among others.

96. Instead, Ripps made excuses for the rebate retention, stating that Bendcare generated savings for physicians in other ways.

97. In short, the repeated representations by Bendcare, Ripps, and Barreirinhas that Bendcare did not profit from rebates and "push[ed] it all" to the rheumatologists were false, and Defendants knew these representations were false at the time the representations were made.

### D. Bendcare Generated "Spread" By Charging Rheumatology Practices Higher Drug Prices Than What Bendcare Negotiated From Wholesalers, Despite Falsely Promising to Deliver the "Best Pricing" for High-Cost Infusion Drugs

98. In addition to retaining manufacturer rebates, Bendcare also failed to pass through to the practices the benefits of lower group-negotiated rates on drug purchases.

99. Plaintiffs have noticed widespread disparities between the prices they pay when purchasing drugs through Bendcare and the available market pricing for the same drugs outside of Bendcare.

100. In fact, marketers for wholesalers and distributors routinely approach Plaintiffs with better pricing than what Bendcare offers on its online platform.

101. As just one example, for the high-cost rheumatoid arthritis drug Orencia, Bendcare consistently charged the physicians more than what is available from competitors, such as Curascript.

102. In Dr. Sabahi's case, a distributor offered $16 less *per vial* for Orencia than what Dr. Sabahi was paying for the same drug through Bendcare.

103. Dr. Sabahi further concluded that, based on his analysis, the competitor would be ultimately cheaper for almost everything, including Orencia.

104. This was not merely the result of poor contracting by Bendcare. Bendcare in fact obtained lower prices from wholesalers and distributors, but invoiced Plaintiffs' practices at higher prices, retaining the difference as profit or "spread."

105. In July 2022, each Plaintiff became members of Cardinal Health's GPO, Cornerstone Rheumatology, after Cardinal purchased a 25% stake in Bendcare.

106. Several Plaintiffs submitted a credit application and signed a contractual addendum enabling their practice to order products directly from Cardinal. Nevertheless, drug purchases for all Plaintiffs' practices after July 2022 continued to be processed through Bendcare's online platform.

107. However, despite purportedly transitioning to Cardinal's GPO, the drug prices invoiced to Plaintiffs by Bendcare regularly exceeded the prices available directly from Cardinal.

108. This occurred because Bendcare was (1) *concealing* the true prices from Cardinal; (2) charging the practices a *margin* on top of those prices; and (3) retaining the difference as "spread."

109. Bendcare concealed the true prices paid for drug purchases and refused to provide pricing details to Plaintiffs. At an October 2024 meeting, Ripps explained that Bendcare does not share pricing with the physicians because "when we published our contract prices, an individual care center has worked against us to try and get a better price."

110. Ripps thus effectively acknowledged that better prices were available to the individual physicians *outside of Bendcare*.

111. In some instances, physicians received an initial drug purchase invoice from Bendcare. But that invoice was later reversed and re-invoiced at a higher price for the same drugs, demonstrating that Defendants were manipulating the prices available from the wholesaler.

112. For example, Dr. Sabahi observed the following reverse-and-rebill sequences for orders of Orencia and the drug Saphnelo as shown below.

a. *Saphnelo (300mg vial)*

| *Date* | *Drug* | *Order No.* | *Qty* | *Transaction Type* | *Unit Price* |
|---|---|---|---|---|---|
| 3/5/2025 | Saphnelo | BC1042104 | -1 | Reversal | -$5,120.60 |
| 3/5/2025 | Saphnelo | BC1042104 | 1 | Charge | $5,173.94 |
| 4/24/2025 | Saphnelo | BC1042750 | -3 | Reversal | -$5,120.60 |
| 4/25/2025 | Saphnelo | BC1042750 | 3 | Charge | $5,173.94 |
| 5/9/2025 | Saphnelo | BC1043129-1 | -2 | Reversal | -$5,120.60 |
| 5/9/2025 | Saphnelo | BC1043129-1 | 2 | Charge | $5,173.94 |
| 5/14/2025 | Saphnelo | BC1042451 | -4 | Reversal | -$5,120.60 |
| 5/14/2025 | Saphnelo | BC1042451 | 4 | Charge | $5,173.94 |
| 9/11/2025 | Saphnelo | BC1043866 | -4 | Reversal | -$5,120.60 |
| 7/8/2025 | Saphnelo | BC1043866 | 4 | Charge | $5,173.94 |

b. *Orencia (250mg vial)*

| *Date* | *Drug* | *Order No.* | *Qty* | *Transaction Type* | *Unit Price* |
|---|---|---|---|---|---|
| 1/5/2026 | Orencia | BC10419843 | 5 | Charge | $975.52 |
| 1/15/2026 | Orencia | BC10419843 | -5 | Reversal | -$975.52 |
| 1/15/2026 | Orencia | BC10419843 | 5 | Charge | $1,566.55 |
| 1/22/2026 | Orencia | BC10419843 | -5 | Reversal | -$1,566.55 |
| 1/22/2026 | Orencia | BC10419843 | 5 | Charge | $1,028.50 |

113. The above demonstrates that Bendcare had a consistent practice of reversing the initial transaction and re-billing the same drugs to the practices at a higher price.

114. Bendcare increased the drug price by approximately $53 per vial for both drugs. Although this may appear insignificant, a typical rheumatology practice could dispense from 500 to 2,500 vials of Orencia per year, amounting to approximately $26,500 to $132,500 in overcharges on a single drug. This figure is one of the many forms of "spread" Bendcare retained on drug prices and reimbursement.

115. Another method by which Bendcare retained "spread" on the cost of infusion drugs was through the manipulation of the payment due date terms ("net terms"). For most drugs, wholesalers offer a discount depending on whether the physician agrees to remit payment within a specific deadline (such as 30, 60, or 90 days), with greater discount being given to orders with shorter payment terms.

116. For example, in 2026, Cardinal Health offered the following per-unit pricing tiers for Orencia:

| *Net 30 days* | *Net 60 days* | *Net 90 days* |
|---|---|---|
| $1,027.68 | $1,030.87 | $1,037.78 |

117. Practices purchased drugs through Bendcare on a net 85-day or 90-day term. However, Bendcare routinely and surreptitiously "switched" those transactions to a shorter net term without Plaintiffs' consent or knowledge.

118. For example, in February 2023, Dr. Sabahi learned that a drug purchase order totaling more than $500,000 (through Cardinal Health) had been switched from an 85-day/90-day net term to a net 60-day term without his knowledge.

119. In fact, the funds were automatically deducted from Dr. Sabahi's bank account at the 60-day mark without Dr. Sabahi's approval.

120. When confronted by Dr. Sabahi about this practice, Bendcare staff member Sheri Kane explained that Barreirinhas had instructed the staff to make the "switch" and stated that she would speak to him about the payment terms. After speaking with Barreirinhas, Kane reverted the transaction back to an 85-day/90-day net term.

121. Critically, although Bendcare manipulated the net terms on drug purchases to obtain better pricing, Bendcare did not share those lower prices with the practices.

122. Instead, Bendcare pocketed the difference between the net 90-day (or 85-day) prices charged to the physicians and the net 30-day or 60-day prices obtained from wholesalers as additional "spread."

123. Bendcare's practice of manipulating payment net terms to siphon additional revenues that should have flowed to Plaintiffs existed prior to the July 2022 Cardinal acquisition of the Bendcare GPO.

124. Prior to July 2022, all Bendcare practices purchased medication through the Curascript platform.

125. Upon information and belief, Curascript offers clients a 90-day payment term, with a 2% discount for clients who pay their bill within 88 days instead of 90 days.

126. Bendcare's GPO had a Distribution Agreement with Curascript that reflected a 90-day payment term for all purchases, but Bendcare billed the purchases to Plaintiffs on a net 85-day term instead. In other words, Plaintiffs were required to remit payment to Bendcare in 85 days, not 90 days.

127. However, the practices never received the 2% discount offered by Curascript even though the invoices were paid within 88 days. That amount was covertly retained by Bendcare as profit.

128. The 2% discount equates to several million dollars in overcharges across the five Plaintiffs' practices that should have been remitted to Plaintiffs.

129. Bendcare's manipulation of invoices, reverse-and-rebill, and other schemes highlight the need for a transparent accounting of all amounts that Bendcare charged the practices for drug purchases.

130. For instance, in 2021, an independent audit conducted by a national accounting and auditing firm found that Bendcare had withdrawn from Dr. Sabahi's

account $114,763.22 more than what invoices and documentation could support. Bendcare then issued a credit of $114,763.22 to Dr. Sabahi's medication account balance.

131. The accounting firm was hired to conduct a one-time audit in connection with Cardinal Health's June 2022 acquisition of a 25% membership interest in Bendcare. Such audits are not routinely conducted by Bendcare, and consequently there are other overcharges for Dr. Sabahi and other Plaintiffs that have gone undetected.

132. Bendcare also prevented physicians from contracting independently for drugs outside the Bendcare platform to obtain better pricing.

133. For instance, when Dr. Sabahi attempted to purchase Saphnelo (manufactured by AstraZeneca) through a different distributor (Curascript), AstraZeneca's contracting director reached out him directly, explaining that pursuant to the terms of the Bendcare-AstraZeneca parent contract, a Bendcare member cannot purchase AstraZeneca's drugs outside of Bendcare.

134. Bendcare physicians are forced to purchase drugs at above-market prices and cannot avail themselves of cheaper prices outside the Bendcare platform, ensuring that the profits continue flowing to Bendcare.

135. In fact, Ripps has made statements to the effect that physicians who purchase drugs from cheaper sources outside of Bendcare may suffer "harm" in other ways.

136. Through the various methods and means outlined herein, including the resale of drugs back to the practices at higher prices than the prices Bendcare paid, manipulation of net payment terms, and other pricing schemes, Bendcare siphoned millions of dollars from Plaintiffs.

137. In short, Bendcare acted as an undisclosed middleman generating substantial revenue by inflating the drug costs paid by the physician practices far above market rates, and even interfered with Plaintiffs' direct purchasing agreements with Cardinal.

**E. Bendcare Routinely Failed to Properly Bill for Services and High-Cost Drugs Utilized by the Practices and Retained Millions of Dollars in Undisbursed Payor Reimbursement For Physicians' Services**

138. Some Plaintiffs also allowed Bendcare to handle billing, collections, and financial management services for their practices.

139. However, Bendcare serially and routinely failed to properly bill for claims and to dispute claims denials on behalf of the physician practices.

140. In numerous instances, rather than vigorously contesting improper claims denials or pursuing full reimbursement, Bendcare either wrote off claims or accepted grossly inadequate settlements from payors. For example, Bendcare accepted settlements of under $100 for Cosentyx—a drug that cost the practices approximately $2,000 to acquire—resulting in a net loss of nearly $1,900 for that specific claim.

141. These billing failures are all the more egregious given the substantial fees Bendcare charged for its billing and claims management services (for those

practices that elected to have Bendcare manage their billing). In addition to the $550 monthly "fair market value" management fee, Bendcare charged a $75 processing fee for each infusion or injection administered by the practices.

142. A rheumatology practice performing approximately 300 infusions per month would therefore incur $22,500 in monthly processing fees alone, plus the $550 management fee—totaling $23,050 per month, or $276,600 annually, paid to Bendcare.

143. Despite collecting these substantial fees, Bendcare's negligent billing practices and failure to adequately pursue claims denials resulted in profound lost revenue for Plaintiffs' practices, entirely undercutting Bendcare's representations that it would generate savings and increased profitability for the physicians.

144. Accepting under-water reimbursement that does not even cover the acquisition cost of high-cost infusion drugs is objectively unreasonable and grossly negligent under any circumstances, and further constitutes breach of Bendcare's contractual and fiduciary duties to Plaintiffs.

145. Bendcare also had a practice of "writing off" insurance/payor claims for infusions and physician services without seeking reimbursement from payors.

146. Bendcare staff maintained an internal spreadsheet containing swaths of claims for unpaid services that Bendcare had simply given up on getting reimbursed from payors.

147. This internal spreadsheet containing substantial sums of unpaid claims was dubbed "Marty's Spreadsheet" by Bendcare's billing staff.

148. When Plaintiffs asked about missing reimbursements on claims, Bendcare staff replied that the claims were "added to Marty's Spreadsheet," indicating that the claims had been effectively written off by Bendcare and no further work would be performed to seek reimbursement on those claims from payors.

149. Barreirinhas confirmed the existence of this internal spreadsheet during the March 2025 conversation between him, Dr. Sona Kamat, and non-party Dr. Vinay Kamat. Barreirinhas described the spreadsheet as containing claims that were not going to be recovered because no further attempts would be made in obtaining payor reimbursement for the claims.

150. Barreirinhas further stated that Bendcare issued refunds for any per-claim fees paid by the practices on the unreimbursed claims.

151. Plaintiffs, however, never received any remittances or statements showing the refunded fees.

152. Bendcare's failure to diligently collect reimbursements from payors caused substantial losses to the practices.

153. Other consistent failures by Bendcare to properly bill for the services performed by Plaintiffs to payors include, but are not limited to:

a. Submitting incorrect drug dosage units

b. Submitting claims to wrong payors or insurance plans

c. Coordination-of-benefit errors, and listing the wrong insurer as the primary payor on claims

d. Prior authorization errors

e. Failing to provide medical records when requested by insurers

f. Failing to submit claims within filing deadlines

154. Even when Bendcare received reimbursements from payors, Bendcare failed to ensure that all such reimbursements were properly disbursed to the appropriate physicians who performed the services.

155. As part of Bendcare's reimbursement management services, Bendcare established and maintained state-specific bank accounts, commonly referred to as "lockboxes," into which payor reimbursements for physician services were deposited.

156. Bendcare received and pooled payor reimbursements owed to the physicians into these lockboxes, organized by state.

157. Under Bendcare's system, the lockbox funds were supposed to be allocated and distributed to each individual practice based on the National Provider Identifier ("NPI") associated with the services performed.

158. However, Bendcare failed to implement adequate systems to ensure that all payor reimbursements would be distributed to the providers who performed the services for which the payment was made. Bendcare was frequently unable—or claimed to be unable—to allocate and distribute the payor reimbursements to the correct physician practices.

159. Bendcare thus could not reliably perform even the most rudimentary of services entrusted to an MSO—the billing of physician services to payors and the distribution of incoming reimbursements to the providers.

160. Millions of dollars in payor reimbursements remained in the lockbox accounts as "undistributed funds" that were never disbursed.

161. Unable to properly allocate or return these funds to their rightful physician owners, Defendants transferred the undistributed funds out of the lockbox accounts and into other accounts under Ripps' and Barreirinhas' control for their own use and benefit.

162. Upon information and belief, Ripps and Barreirinhas funneled money from Bendcare into personal accounts, charities, and other "companies" controlled by Defendants including WhiteGlove Rx, Oasis Health, and Golden Retrievals, among others.

### F. Bendcare's Spread Pricing Scheme Continued After Cardinal Health's July 2022 Acquisition of Bendcare's GPO

163. On or about June 28, 2022, Cardinal agreed to acquire a 25% membership interest in Bendcare.

164. Cardinal used the Bendcare acquisition to enter the rheumatology market and substantially expand its GPO operations.

165. In a press release announcing the acquisition, Cardinal stated, "Following the acquisition of [Bendcare's GPO] CPO-GPO, current Bendcare-affiliated CPO-GPO members will transition to Cardinal Health's Cornerstone

Rheumatology™ GPO, and Cardinal Health will be the exclusive distributor for those practices."[5]

166. In that same press release, Cardinal repeated the same factual misrepresentations made by Bendcare.

167. Specifically, Cardinal stated that it was collaborating with Bendcare to "create an integrated suite of clinical, practice management and distribution solutions to help support the success and financial health of rheumatology practices nationwide," and that by joining Bendcare, a physician could "[g]ain physician purchasing power and access manufacturer rebates that leverage Cardinal Health™ Cornerstone Rheumatology™ GPO membership volume to negotiate preferred pricing."[6]

168. Cardinal knew the above representations were false.

169. Ripps told Dr. Sabahi at the December 2025 meeting that Bendcare and Cardinal conduct quarterly pricing analyses to verify that Bendcare's prices were consistent with market rates. Even Ripps, however, acknowledged that there was "spread" on the drug prices charged by Bendcare.

170. Cardinal thus knew that the prices that Bendcare charged and invoices to Plaintiffs were higher than the prices available from Cardinal directly.

---

[5] *See* https://newsroom.cardinalhealth.com/2022-07-06-Cardinal-Health-acquires-the-Bendcare-CPO-GPO-entity-and-makes-a-minority-investment-in-the-Bendcare-MSO (July 6, 2022 Press Release).

[6] https://www.cardinalhealth.com/en/services/specialty-physician-practice/rheumatology/ collaborating-with-bendcare.html.

171. Cardinal took no steps to stop Bendcare's spread pricing scheme and other breaches alleged herein because of profit—the surplus revenue generated by Bendcare at Plaintiffs' expense translated to higher member distributions from Bendcare.

172. Cardinal thus enabled Bendcare to continue misrepresenting the true drug prices Bendcare obtained from Cardinal after July 2022.

**G. Bendcare Failed to Properly Credential the Practices with Payors and to Manage Medicare MIPS Submissions, Resulting in Reduced Reimbursements from Payors**

173. In addition to the foregoing, Bendcare undertook responsibility for critical administrative functions that impact the reimbursement Plaintiffs' practices received from payors for their services, including (1) credentialing the physicians and practices with insurance carriers and payors, and (2) managing and submitting the practices' data under Medicare's MIPS.

174. The MSO Agreements between Plaintiffs and Bendcare expressly included "Pay[o]r credentialing administrative support services" under "Management Services."

175. The Bendcare physician onboarding email also included "credentialing" and "MIPS" in the full list of services that Bendcare would provide.

176. Bendcare failed in both respects, causing Plaintiffs to suffer reduced and denied reimbursement.

177. MIPS is a Medicare program that adjusts payments to eligible clinicians based on their reported performance. Each year, a practice's MIPS data is extracted

from its electronic health record system and submitted to the Centers for Medicare & Medicaid Services ("CMS"). CMS then assigns the practice a MIPS final score on a scale of 0 to 100, which determines whether the practice receives a positive payment adjustment (an incentive) or a negative payment adjustment (a penalty) up to 9% on its Medicare reimbursements.

178. MIPS payment adjustments are applied two years after the performance year. For example, data reported for performance year 2024 determines the payment adjustment applied to Medicare reimbursements in 2026. Moreover, the adjustment applies to *all* of the practice's Medicare Part B payments for covered professional services, not merely to a particular service line. To avoid a penalty, MIPS data must be submitted accurately, completely, and in a manner optimized to capture all information CMS requires to evaluate the practice's performance.

179. Although a negative adjustment of less than 1% may appear modest, for a high-volume rheumatology practice administering costly infusion drugs, even a fractional penalty applied across all Medicare reimbursements can amount to several hundred thousand dollars annually, significantly eroding the practice's already thin margins.

180. One of the value propositions Bendcare marketed to physicians was that Bendcare would facilitate and manage the mandatory MIPS reporting for its member practices. Bendcare expressly undertook this responsibility for numerous practices, including Dr. Kamat's practice. Bendcare's personnel, including Kathi Garrett, who organized Bendcare's MIPS reporting function, confirmed in writing that Bendcare

would specifically handle MIPS reporting on the practices' behalf. Ripps likewise participated in and confirmed these communications.

181. Bendcare failed to properly prepare, optimize, and submit the practices' MIPS data. As a direct result of Bendcare's deficient handling of the MIPS performance, affected physician practices were assessed negative payment adjustments on all Medicare reimbursements.

182. For example, Dr. Kamat's practice was assessed a negative payment adjustment of 0.71% on all Medicare reimbursements in 2026 based on improper and insufficient MIPS data submissions in 2024—a penalty the practice continues to bear even though it had already terminated its relationship with Bendcare.

183. Because the MIPS adjustment applies to all Medicare payments, Bendcare's failure has harmed even those portions of the practice that Bendcare did not manage. Although Bendcare did not manage the practice's cognitive (office visit) services, the practice is being penalized on reimbursements for both its cognitive and infusion services as a result of Bendcare's deficient MIPS reporting.

184. Bendcare's failures extended into the 2025 performance year. Plaintiffs have since learned from a representative of their electronic health record vendor, CareCloud, that Dr. Kamat's practice was not even included on the list of practices for which 2025 MIPS data was to be reported by Bendcare or its designee. Upon information and belief, the practice will therefore be subject to an additional negative payment adjustment on its 2027 Medicare reimbursements.

185. Bendcare also undertook responsibility for credentialing the physicians and practices with insurance carriers and payors, including state Medicaid programs and Medicaid managed care plans. Proper credentialing is a precondition to reimbursement; a payor will not pay claims submitted for services rendered by a provider who is not properly credentialed and enrolled.

186. Upon information and belief, Bendcare failed to properly credential Plaintiffs' practices with payors, including Medicaid plans.

187. As one example, for approximately three years, Dr. Kamat's practice repeatedly advised Bendcare that it did not appear to be receiving payment for Medicaid claims for either infusion services or cognitive (office visit) services. Each time, Bendcare insisted that the credentialing was correct and that the practice had nothing to worry about.

188. Only after the practice pressed Bendcare to verify the Medicaid credentialing did Bendcare reveal that the practice was, in fact, not properly credentialed. As a result, claims for both infusion and cognitive services went unpaid for approximately three years.

189. Compounding the harm, during the period in which the practice was improperly credentialed, Bendcare instructed the practice to continue infusing Medicaid patients. The practice did so in reliance on Bendcare's assurances, incurring the substantial acquisition cost of high-cost infusion drugs for which it was never reimbursed.

190. Bendcare personnel communicated with the practice regarding these credentialing failures through a dedicated Microsoft Teams chat titled "Medicaid Issues Dr Kamat." Upon information and belief, in or around October 2026, after Plaintiffs' disputes with Bendcare arose, Bendcare deleted the practices' Teams channels, including communications concerning the credentialing failures. Plaintiffs have preserved portions of those communications.

### H. Defendants' Active Concealment of Their Rebate Retention, Spread Pricing, and Misappropriation of Payor Reimbursements Delays Accrual of Plaintiffs' Claims

191. Defendants' retention of 70% (or more) of rebates, spread pricing, diversion of payor reimbursements, and service failures alleged above are ongoing and continuing to the present day.

192. To the extent part of Defendants' misconduct dates as far back as 2015 or 2016, Plaintiffs' claims did not accrue until May 2025, based on Defendants' active concealment of the rebate retention, spread pricing, and misappropriation scheme.

193. Under Fla. Stat. § 95.031(2)(a) (2026), the limitations period for an action "founded upon fraud" begins to run "from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence."

194. Here, Defendants engaged in affirmative acts to conceal their wrongful conduct.

195. As to rebates, Defendants have consistently refused to share the rebate agreements with manufacturers, despite repeated requests from Plaintiffs and other physicians.

196. Defendants also did not disclose, prior to May 2025, that Bendcare was retaining a substantial share of rebates (70% or more). Defendants did so only after sustained pressure from physicians demanding an actual breakdown of the rebates. Defendants further admitted this retention reflected "the standard formula," meaning Defendants had been secretly retaining rebates since the inception of the scheme, while simultaneously representing the opposite to Plaintiffs.

197. This deliberate withholding of information prevented Plaintiffs from discovering that Bendcare was retaining a substantial portion of rebates contrary to its express representations.

198. Similarly, Defendants concealed their spread pricing scheme by controlling all drug purchasing through Bendcare's online platform and refusing to provide transparency into the actual prices Bendcare obtained from wholesalers and manufacturers. Plaintiffs had no means to independently verify whether Bendcare was passing through the negotiated prices or secretly marking up the drugs for its own profit.

199. Defendants' scheme was also inherently self-concealing. Plaintiffs entrusted Bendcare with exclusive control over billing, collections, financial management, and bank accounts—including the lockbox accounts where payor reimbursements were deposited. This arrangement gave Defendants sole access to

the financial data necessary to uncover the scheme while depriving Plaintiffs of the ability to independently audit Bendcare's activities.

200. Plaintiffs exercised reasonable diligence by repeatedly seeking clarity from Bendcare regarding rebate rates, drug pricing, and financial performance. However, Defendants' active concealment and control over the relevant financial data prevented Plaintiffs from discovering the true nature and extent of Defendants' misconduct until May 2025 at the earliest.

201. Accordingly, the applicable limitations period did not begin to run until on or around May 2025—the date Defendants first disclosed their rebate retention practices—and Plaintiffs' claims are timely.

202. All conditions precedent to the filing of this action have been satisfied, performed, or waived.

203. Plaintiffs have retained the undersigned counsel to represent them in this action and have obligated themselves to pay undersigned counsel's attorneys' fees and costs.

**COUNT I**
**<u>Breach of Common-Law Fiduciary Duty</u>**
*(all Plaintiffs against all Defendants)*

204. Plaintiffs incorporate by reference Paragraphs 1–203 as if fully set forth herein.

205. Defendants assumed a fiduciary relationship with Plaintiffs by obtaining exclusive control over the practices' negotiation of rebates and other discounts from manufacturers and wholesalers. For some Plaintiffs, Defendants also

assumed control over the practices' billing, collections, financials, and bank accounts, including the lockbox accounts into which payor reimbursements were deposited.

206. Under Florida law, a fiduciary relationship arises where a relation of trust and confidence exists between the parties. As the Florida Supreme Court explained in *Quinn v. Phipps*, 113 So. 419, 421 (1927): "Stripped of all embellishing verbiage it may be confidently asserted that every instance in which a confidential or fiduciary relation in fact is shown to exist will be interpreted as such. The relation and duties involved need not be legal, they may be moral, social, domestic or personal. If a relation of trust and confidence exists between the parties, that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused, that is sufficient as a predicate for relief. The origin of the confidence is immaterial."

207. Plaintiffs reposed confidence in Defendants, and Defendants accepted that trust, by entrusting Defendants with exclusive special power of attorney over billing, collections, expense reimbursement and account transfers.

208. Plaintiffs further entrusted Defendants with exclusive authority to negotiate rebates and discounts on their practices' behalf and, for some Plaintiffs, with control over the practices' billing, collections, financials, and bank accounts, including the lockbox accounts into which payor reimbursements were deposited. Plaintiffs depended on Defendants to collect, hold, and remit these funds and lacked independent access to the information necessary to verify Defendants' conduct.

209. Defendants acquired that confidence by representing themselves as experts in the areas of drug purchasing, rebate administration, pharmaceutical contracting, and billing and financial management. Defendants abused that trust and confidence by using their control over the practices' rebates, pricing, and funds to benefit themselves at Plaintiffs' expense. Accordingly, a fiduciary relationship existed between Plaintiffs and Defendants under Florida law.

210. Defendants owed Plaintiffs fiduciary duties of loyalty, good faith, and fair dealing, including the duty to act in the best interests of the practices and to account for all funds received on their behalf.

211. Defendants breached their fiduciary duties by, inter alia: (a) retaining rebates that belonged to the practices; (b) charging spread pricing on drugs rather than passing through negotiated prices; (c) retaining and converting undisbursed payor reimbursements; and (d) failing to provide transparent accounting for funds received on behalf of the practices.

212. As a direct and proximate result of Defendants' breaches of fiduciary duty, Plaintiffs have suffered damages in an amount to be determined at trial.

**COUNT II**
**Fraudulent Inducement**
*(all Plaintiffs against all Defendants)*

213. Plaintiffs incorporate by reference Paragraphs 1–203 as if fully set forth herein.

214. Prior to and in connection with Plaintiffs' execution of the MSO Agreements, Defendants made false statements of material facts, including that

Bendcare would pass through 100% of rebates to the practices, deliver the lowest available drug pricing, and generate substantial cost savings for the physicians.

215. Defendants knew or should have known that these representations were false at the time they were made, or made them with reckless disregard for their truth or falsity.

216. Defendants made these misrepresentations with the intent to induce Plaintiffs to enter into the MSO Agreements.

217. Plaintiffs justifiably relied on Defendants' misrepresentations in deciding to enter into the MSO Agreements.

218. As a direct and proximate result of Defendants' fraudulent inducement, Plaintiffs have suffered damages in an amount to be determined at trial.

**COUNT III**
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
Fla. Stat. §§ 501.201 *et seq*. (2026)
*(all Plaintiffs against all Defendants)*

219. Plaintiffs incorporate by reference Paragraphs 1–203 as if fully set forth herein.

220. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 *et seq.*, prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

221. Defendants engaged in unfair and deceptive trade practices by making false representations regarding rebate pass-through, drug pricing, and cost savings,

while secretly retaining rebates, implementing spread pricing, and misappropriating payor reimbursements.

222. Defendants' conduct was likely to, and did, deceive consumers acting reasonably under the circumstances. Defendants' violations caused injury or detriment to consumers. As relevant here, Plaintiffs and other physician practices are the "consumers" of Defendants' services who were injured by Defendants' unfair and deceptive trade practices.

223. As a direct and proximate result of Defendants' violations of FDUTPA, Plaintiffs have suffered actual damages and are entitled to recover such damages, attorney's fees, and costs pursuant to Fla. Stat. §§ 501.211 and 501.2105(1).

**COUNT IV**
**Conversion**
*(all Plaintiffs against all Defendants)*

224. Plaintiffs incorporate by reference Paragraphs 1–203 as if fully set forth herein.

225. Plaintiffs had an ownership interest in the payor reimbursements, the rebates paid by drug manufacturers on Plaintiffs' drug purchases, and the cost savings resulting from Bendcare's group purchasing activities.

226. The payor reimbursements and manufacturer rebates are specific, identifiable funds that belong to Plaintiffs, not general obligations of Defendants to pay money. Payor reimbursements were deposited into designated lockbox accounts for the benefit of the practices, and rebates were generated by and attributable to Plaintiffs' own drug purchases. Defendants received and held these funds solely on

Plaintiffs' behalf, and the funds were at all times Plaintiffs' property held in trust for Plaintiffs. Plaintiffs' conversion claim therefore does not seek merely to recover a debt or money damages for Defendants' failure to pay; it seeks the return of Plaintiffs' own property that Defendants wrongfully took and retained.

227. Defendants wrongfully exercised dominion and control over these funds by retaining up to 70% or more of rebates, implementing spread pricing that retained the difference between acquisition costs and invoiced prices, and transferring undisbursed payor reimbursements out of the lockbox accounts for their own use.

228. Defendants' actions were inconsistent with Plaintiffs' ownership rights and deprived Plaintiffs of funds to which they were entitled.

229. As a direct and proximate result of Defendants' conversion, Plaintiffs have suffered damages in an amount to be determined at trial.

**COUNT V**
**Negligence**
*(all Plaintiffs against Bendcare LLC)*

230. Plaintiffs incorporate by reference Paragraphs 1–203 as if fully set forth herein.

231. As set forth in this pleading, Bendcare agreed to provide management services to Plaintiffs' practices, including negotiating and passing through rebates and discounts, purchasing drugs for the practices, billing and collecting payor reimbursements, disputing claim denials, disbursing funds received on the practices' behalf, credentialing Plaintiffs with insurance plans and payors, and submitting MIPS data to CMS.

232. In the performance of the above services, Bendcare owed Plaintiffs a duty to exercise reasonable care.

233. Bendcare breached its duty of reasonable care by, inter alia: (a) retaining up to 70% or more of rebates; (b) implementing a spread pricing scheme that charged the practices higher drug prices than Bendcare obtained; (c) failing to properly bill for claims and dispute claims denials; (d) failing to dispute claims denials and accepting underwater reimbursements on high-cost infusion drugs; (e) retaining millions of dollars in undisbursed payor reimbursements; (f) failing to properly credential Plaintiffs with insurance plans and payors; and (g) failing to accurately submit MIPS data to CMS.

234. As a direct and proximate result of Bendcare's negligence, Plaintiffs have suffered damages in an amount to be determined at trial.

**COUNT VI**
**Breach of Contract**
In the Alternative to Counts I-V
*(all Plaintiffs against Bendcare LLC)*

235. Plaintiffs incorporate by reference Paragraphs 1–203 as if fully set forth herein.

236. Each Plaintiff and Bendcare entered into valid, enforceable MSO Agreements.

237. The MSO Agreements required Bendcare to provide management services, including billing, collections, payor contracting, group purchasing, payor credentialing, and financial management.

238. In addition to the express terms of the MSO Agreement, each Plaintiff and Defendants modified that Agreement through their conduct and written and oral communications, that Defendants would pass through rebates, the lowest available drug pricing, and higher payor reimbursements that Bendcare negotiated and obtained from drug manufacturers, wholesalers, and payors, to Plaintiffs' practices.

239. Nothing in the MSO Agreements authorized Bendcare to retain rebates, charge spread pricing on drugs, or retain undisbursed payor reimbursements belonging to the practices.

240. Bendcare materially breached the MSO Agreements by: (a) retaining up to 70% or more of rebates; (b) implementing a spread pricing scheme that charged the practices higher drug prices than Bendcare obtained; (c) failing to properly bill for claims and dispute claims denials; (d) failing to dispute claims denials and accepting underwater reimbursements on high-cost infusion drugs; (e) retaining millions of dollars in undisbursed payor reimbursements; (f) failing to properly credential Plaintiffs with insurance plans and payors; and (g) failing to accurately submit MIPS data to CMS.

241. As a direct and proximate result of Bendcare's material breaches, Plaintiffs have suffered damages in an amount to be determined at trial.

**COUNT VII**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

In the Alternative to Counts I-V

*(all Plaintiffs against Bendcare LLC)*

242. Plaintiffs incorporate by reference Paragraphs 1–203 as if fully set forth herein.

243. Each Plaintiff and Bendcare entered into valid, enforceable MSO Agreements.

244. Under Florida law, the duty of good faith and fair dealing is recognized in every contract. *See Cty. of Brevard v. Miorelli Eng'g, Inc.*, 703 So. 2d 1049, 1050 (Fla. 1997) ("[E]very contract includes an implied covenant that the parties will perform in good faith."). The implied covenant of good faith and fair dealing is designed to protect the contracting parties' reasonable expectations. *Speedway SuperAmerica, LLC v. Tropic Enters., Inc.*, 966 So. 2d 1, 3 (Fla. 2d DCA 2007). A claim for breach of the implied covenant must relate to the performance of an express term of the contract. *Diageo Dominicana, S.R.L. v. United Brands, S.A.*, 314 So. 3d 295, 299 (Fla. 3d DCA 2020).

245. Here, the MSO Agreements contained express terms requiring Bendcare to provide management services, including billing, collections, payor contracting, group purchasing, payor credentialing, and financial management.

246. Nothing in the MSO Agreements authorized Bendcare to retain rebates, charge spread pricing on drugs, or retain undisbursed payor reimbursements belonging to the practices.

247. Bendcare materially breached the implied duty of good faith and fair dealing in the performance of the aforementioned express terms by: (a) retaining up to 70% or more of rebates; (b) implementing a spread pricing scheme that charged the

practices higher drug prices than Bendcare obtained; (c) failing to properly bill for claims and dispute claims denials; (d) failing to dispute claims denials and accepting underwater reimbursements on high-cost infusion drugs; (e) retaining millions of dollars in undisbursed payor reimbursements; (f) failing to properly credential Plaintiffs with insurance plans and payors; and (g) failing to accurately submit MIPS data to CMS.

248. Bendcare further breached the covenant of good faith and fair dealing by concealing the above service failures and refusing to provide documents, contracts, and data that would reveal the rebates, "spread," and other revenues Bendcare surreptitiously siphoned from Plaintiffs' practices.

249. As a direct and proximate result of Bendcare's material breaches, Plaintiffs have suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a) Award Plaintiffs compensatory damages in an amount to be determined at trial;

(b) Award Plaintiffs restitution and disgorgement of Defendants' ill-gotten profits;

(c) Award Plaintiffs reasonable attorney's fees and costs pursuant to applicable law, including Fla. Stat. §§ 501.211 and 501.2105(1);

(d) Award costs and prejudgment and post-judgment interest as allowed by law; and

(e) Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a jury trial on all issues so triable.

Dated: November 12, 2026

Respectfully submitted,

*/s/ Ryan H. Lehrer*

**Tripp Scott, P.A.**
110 SE 6th Street, Suite 1500
Fort Lauderdale, FL 33301
Telephone: 954-525-7500
Facsimile: 954-761-8475
**Paul O. Lopez**
Florida Bar No. 983314
pol@trippscott.com
sxc@trippscott.com
**Ryan H. Lehrer**
Florida Bar No. 884423
rhl@trippscott.com
sxc@trippscott.com
**Jennifer H. Wahba**
Florida Bar No. 1010093
jmh@trippscott.com
stl@trippscott.com
*Attorneys for Plaintiffs*

and

**Matthew J. Modafferi**
(*pro hac vice* forthcoming)
**Frier & Levitt, LLC**
One World Trade Center
Suite 45E
285 Fulton Street
New York, New York 10007
(646) 970-2711
mmodafferi@frierlevitt.com
*Attorneys for Plaintiffs*